# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 28, 2012

Lyle W. Cayce
Clerk

No. 12-10542

In the Matter of: VITRO SAB DE CV,

     Debtor

_____

AD HOC GROUP OF VITRO NOTEHOLDERS,

     Appellant

v.

VITRO SAB DE CV,

     Appellee

_____

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Consolidated with No. 12-10689

In the Matter of: VITRO SAB DE CV,

     Debtor

_____

VITRO SAB DE CV,

     Appellant

Nos. 12-10542, 12-10689, 12-10750

v.

AD HOC GROUP OF VITRO NOTEHOLDERS; WILMINGTON TRUST, NATIONAL ASSOCIATION, solely in its capacity as indenture trustee; U.S. BANK NATIONAL ASSOCIATION,

     Appellees

_____

_____

Appeal from the United States Bankruptcy Court
for the Northern District of Texas

_____

Consolidated with No. 12-10750

In the Matter of: VITRO SAB DE CV

     Debtor

_____

FINTECH INVESTMENTS, LIMITED,

     Appellant

v.

AD HOC GROUP OF VITRO NOTEHOLDERS; WILMINGTON TRUST, NATIONAL ASSOCIATION, solely in its capacity as indenture trustee; U.S. BANK NATIONAL ASSOCIATION,

     Appellees

_____

Appeal from the United States Bankruptcy Court
for the Northern District of Texas

_____

Nos. 12-10542, 12-10689, 12-10750

Before KING, SMITH, and BARKSDALE, Circuit Judges.

KING, Circuit Judge:

Consolidated before us are three cases relating to the Mexican reorganization proceeding of Vitro S.A.B. de C.V., a corporation organized under the laws of Mexico.  The Ad Hoc Group of Vitro Noteholders, a group of creditors holding a substantial amount of Vitro's debt, appeal from the district court's decision affirming the bankruptcy court's recognition of the Mexican reorganization proceeding and Vitro's appointed foreign representatives under Chapter 15 of the Bankruptcy Code.  Vitro and one of its largest third-party creditors, Fintech Investments, Ltd., each appeals directly to this court the bankruptcy court's decision denying enforcement of the Mexican reorganization plan because the plan would extinguish the obligations of non-debtor guarantors. For the following reasons, we affirm the district court's judgment recognizing the Mexican reorganization proceeding and the appointment of the foreign representatives.    We also affirm the bankruptcy court's order denying enforcement of the Mexican reorganization plan.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Vitro S.A.B. de C.V. and the 2008 Financial Crisis

Vitro S.A.B. de C.V. ("Vitro") is a holding company that, together with its subsidiaries, constitutes the largest glass manufacturer in Mexico.  Originally incorporated in 1909, Vitro operates manufacturing facilities in seven countries, as well as distribution centers throughout the Americas and Europe, and exports its products to more than 50 countries worldwide.  Vitro employs approximately 17,000 workers, the majority of whom work in Mexico.  Between February 2003 and February 2007, Vitro borrowed a total of approximately $1.216 billion, predominately from United States investors.  Vitro's indebtedness is evidenced by three series of unsecured notes.  The first series was issued on October 22, 2003 and consisted of $225 million aggregate principal amount of 11.75% notes

3

due 2013; the second and third series were issued on February 1, 2007, and consisted of $300 million of 8.625% notes due 2012 and $700 million of 9.125% notes due 2017 (collectively the "Old Notes").

Payment in full of the Old Notes was guaranteed by substantially all of Vitro's subsidiaries (the "Guarantors"). The guaranties provide that the obligations of the Guarantors will not be released, discharged, or otherwise affected by any settlement or release as a result of any insolvency, reorganization, or bankruptcy proceeding affecting Vitro. The guaranties further provide that they are to be governed and construed under New York law and include the Guarantors' consent to litigate any disputes in New York state courts. The guaranties state that "any rights and privileges that [Guarantors] might otherwise have under the laws of Mexico shall not be applicable to th[e] Guarant[ies]."

In the latter half of 2008, Vitro's fortunes took a turn for the worse when the global financial crisis significantly reduced demand for its products. Vitro's operating income declined by 36.8% from 2007 to 2008, and an additional 22.3% from 2008 to 2009. In February of 2009, Vitro announced its intention to restructure its debt and stopped making scheduled interest payments on the Old Notes.

**B.    Vitro Restructures Its Obligations**

After Vitro stopped making payments on the Old Notes, it entered into a series of transactions restructuring its debt obligations. On December 15, 2009, Vitro entered into a sale leaseback transaction with Fintech Investments Ltd. ("Fintech"), one of its largest third-party creditors, holding approximately $600 million in claims (including $400 million in Old Notes). Under the terms of this agreement, Fintech paid $75 million in exchange for the creation, in its favor, of a Mexican trust composed of real estate contributed by Vitro's subsidiaries. This real estate was then leased to one of Vitro's subsidiaries to continue normal

operations. The agreement also gave Fintech the right to acquire 24% of Vitro's outstanding capital or shares of a sub-holding company owned by Vitro in exchange for transferring Fintech's interest in the trust back to Vitro or its subsidiaries.

Partly as a result of these transactions, Vitro generated a large quantity of intercompany debt. Previously, certain of Vitro's operating subsidiaries directly and indirectly owed Vitro an aggregate of approximately $1.2 billion in intercompany debt. As a result of a series of financial transactions in December of 2009, that debt was wiped out and, in a reversal of roles, Vitro's subsidiaries became creditors to which Vitro owed an aggregate of approximately $1.5 billion in intercompany debt. Despite requests by holders of Old Notes, Vitro did not disclose these transactions. In August of 2010, Fintech purchased claims by five banks holding claims against Vitro and its subsidiaries and extended the maturity of various promissory notes issued by Vitro's subsidiaries. Pursuant to a "Lock-up Agreement" completed between Fintech and Vitro, Fintech also agreed not to transfer any debt it held in Vitro unless such transfer was in line with the terms of that agreement.

Only in October of 2010, approximately 300 days after completing the transactions with its subsidiaries, did Vitro disclose the existence of the subsidiary creditors. This took the transactions outside Mexico's 270-day "suspicion period," during which such transactions would be subject to additional scrutiny before a business enters bankruptcy.

## C.    **Vitro Commences a *Concurso* Proceeding in Mexican Court**

Between August 2009 and July 2010, Vitro engaged in negotiations with its creditors and submitted three proposals for reorganization. Each was rejected by creditors. After the last proposal, the Ad Hoc Group of Vitro Noteholders (the "Noteholders"), a group of creditors holding approximately 60% of the Old Notes, issued a press release "strongly recommend[ing]" that all

holders of the Old Notes deny consent to any reorganization plan that the Noteholders had not approved. On November 1, 2010, Vitro disclosed its intention to commence a voluntary reorganization proceeding in Mexico, together with a pre-packaged plan of reorganization. On December 13, 2010, Vitro initiated in a Mexican court a *concurso* proceeding under the Mexican Business Reorganization Act, or *Ley de Concursos Mercantiles* ("LCM").[1]

The Mexican court initially rejected Vitro's filing on January 7, 2011, because Vitro could not reach the 40% creditor approval threshold necessary to file a *concurso* petition without relying on intercompany claims held by its subsidiaries. On April 8, 2011, that decision was overruled on appeal and Vitro was then declared to be in bankruptcy, or *concurso mercantil*. Pursuant to Mexican law, Javier Luis Navarro Velasco was appointed as *conciliador*.[2]

The *conciliador* was tasked with filing an initial list of recognized claims and mediating the creation of a reorganization plan. The *conciliador* did so, and on August 5, 2011, filed a proposed final list of recognized creditors, which included those subsidiaries holding intercompany debt. The *conciliador* then negotiated terms of a reorganization plan between Vitro and the recognized creditors to submit to the Mexican court for approval. Throughout this process, the parties were apparently in frequent contact with the Mexican court on an ex parte basis.

---

[1] A *concurso* proceeding is the Mexican equivalent of a voluntary judicial reorganization proceeding under United States law.

[2] A *conciliador* is an individual appointed by the *Instituto Federal de Especialistas de Concursos Mercantiles*—the Federal Institute of Specialists of Insolvency Procedures—to serve as a quasi-judicial officer with certain responsibilities in a *concurso* proceeding, including filing an initial list of recognized claims, mediating a plan, and, if necessary to protect the debtor's estate, managing the debtor's business. A *conciliador's* pay is based on the number of recognized claims in a *concurso* proceeding, a fact the Noteholders argue encouraged him to recognize intercompany claims. The Noteholders also point out that, in this case, the *conciliador's* law firm provided legal services to Vitro since 2001, and that the *conciliador* retained, as his financial advisor, a firm that also acted as Vitro's internal auditor.

Nos. 12-10542, 12-10689, 12-10750

1.    **Terms of the *Concurso* Plan**

On December 5, 2011 the *conciliador* submitted to the Mexican court a proposed restructuring plan (the "*Concurso* plan" or "Plan") substantially identical to the one Vitro had originally proposed.  Under the terms of the Plan, the Old Notes would be extinguished and the obligations owed by the Guarantors would be discharged.  Specifically, the Plan provides that:

> [O]nce this Agreement is approved by the Court . . . this Agreement . . . will substitute, pay, replace and terminate the above obligations, instruments, securities, agreements and warranties in which were agreed upon Approved Credits and, therefore . . . will terminate personal guarantees granted a third and/or direct and indirect subsidiaries [sic] of Vitro with regards to the obligations, instruments, securities and agreements that gave rise to the Approved Credits.

The Plan further provides that Vitro would issue new notes payable in 2019 (the "New 2019 Notes"), with a total principal amount of $814,650,000. The New 2019 Notes would be issued to Vitro's third-party creditors (not including those subsidiaries holding intercompany debt, who would forgo their *pro rata* share of the Plan's consideration and instead receive other promissory notes).  The New 2019 Notes would bear a fixed annual interest rate of 8.0%, but would "not have . . . payments of principal during the first 4 (years) years [sic] . . . and from the fifth year of operation and until the seventh year . . . will have repayments or payments of [a] total principal amount of $23,960,000.00 USD . . . payable semiannually on June 30 and December 31 of each year and the remaining balance upon due date."  The New 2019 Notes would also "be unconditionally and supportively guaranteed for each of the Guarantors." Payment under the New 2019 Notes would go into a third-party payment trust, which would deliver payment to those creditors who had consented to the Plan. A second trust would be created to pay non-consenting creditors upon their

written agreement to the terms of the Plan.  In addition to the New 2019 Notes, Vitro would also provide to the holders of the Old Notes $95,840,000 aggregate principal amount of new mandatory convertible debt obligations ("MCDs") due in 2015 with an interest rate of 12%, convertible into 20% equity in Vitro if not paid at full maturity.  Finally, the Plan also provided cash consideration of approximately $50 per $1000 of principal of Old Notes.

### 2.    The *Concurso* Plan is Approved

Under Mexican law, approval of a reorganization plan requires votes by creditors holding at least 50% in aggregate principal amount of unsecured debt. As distinguished from United States law, Mexico does not divide unsecured creditors into interest-aligned classes, but instead counts the votes of all unsecured creditors, including insiders, as a single class.  As a result, although creditors holding 74.67% in aggregate principal amount of recognized claims voted in favor of the plan, over 50% of all voting claims were held by Vitro's subsidiaries in the form of intercompany debt.  The 50% approval threshold could not have been met without the subsidiaries' votes.  After the initial approval, the LCM provides a period during which objecting creditors can veto the plan. A veto requires agreement by recognized creditors holding a minimum of 50% in aggregate principal amount of debt or by recognized creditors numbering at least 50% of all unsecured creditors.  As only 26 of the 886 recognized creditors sought to veto the *Concurso* plan, and as those creditors held less than 50% of the aggregate recognized debt, the veto failed.[3]

The Mexican court approved the *Concurso* plan on February 3, 2012.  On February 23, 2012, the Plan went into effect, and Vitro issued New 2019 Notes and MCDs and paid restructuring cash into two third-party payment trusts, one for consenting creditors and the other for non-consenting creditors.  The

---

[3] Of the creditors resisting veto of the Plan, approximately 360 were Vitro employees to each of whom Vitro had issued a note in the amount of $1,000 prior to the Plan's filing.

*Concurso* plan approval order has been appealed, and such appeal has been accepted by, and is currently pending in, the Mexican judicial appellate system; no stay of effectiveness of the *Concurso* plan was entered.[4]

## D.  Objecting Creditors Resist Enforcement

While objecting to the *concurso* proceeding in Mexico, creditors dissatisfied with Vitro's reorganization efforts attempted to collect on the Old Notes and guaranties in a variety of ways.  By April 2010, Vitro had received acceleration notices for all the Old Notes.  On November 17, 2010, involuntary Chapter 11 petitions were filed against fifteen Guarantors domiciled in the United States.[5] Various holders of Old Notes also commenced two substantially identical lawsuits in New York state court against Vitro and 49 Guarantors, resulting in orders of attachment with respect to any property located in New York.

Parallel to the *concurso* proceeding, in August 2011, Wilmington Trust, National Association ("Wilmington"), the indenture trustee for the Old Notes due in 2012 and 2017, filed suit in New York state court against various of the Guarantors, seeking a declaratory judgment confirming the Guarantors' obligations under the related indentures.  The state court granted partial summary judgment in Wilmington's favor on December 5, 2011.  The court held that New York law applied to the dispute and that under the unambiguous terms of the relevant Old Notes, "any non-consensual release, discharge or

---

[4] Letters submitted to this court demonstrate that substantially all of the issues relating to enforcement of the Plan before us are also being appealed in Mexican courts.

[5] This matter proceeded to trial on March 31, 2011.  As a result of this proceeding, four of Vitro's subsidiaries requested permission to sell substantially all their assets.  Vitro's subsidiaries continued resisting the Noteholders' efforts and, initially, received favorable judgments that they were generally paying their debts as they became due or that no demand for payment had been made at the time the involuntary proceedings were commenced.  That decision was appealed and, on August 28, 2012, the United States District Court for the Northern District of Texas held that the bankruptcy court erred in its findings and vacated that court's order.

modification of the obligations of the Guarantors . . . is prohibited." *Wilmington Trust v. Vitro Automotriz, S.A. de C.V.*, 943 N.Y.S.2d 795 (table), 2011 WL 6141025, at *6 (N.Y. Sup. Ct. Dec. 5, 2011). The court went on to find, however, that "whether such prohibitive provisions may be modified or eliminated by applicable Mexican laws is not at issue here." *Id.* at *5.[6] A separate suit brought by U.S. Bank National Association ("U.S. Bank"), the indenture trustee for the Old Notes due in 2013, achieved the same outcome.

**E.    Vitro Commences a Chapter 15 Proceeding in the United States**

On October 29, 2010, Vitro's Board of Directors appointed Alejandro Sanchez-Mujica to act as Vitro's foreign representative. On April 14, 2011, Sanchez-Mujica commenced a Chapter 15 proceeding in United States bankruptcy court by filing a petition for recognition of the Mexican *concurso* proceeding.[7] The petition was originally filed in the United States Bankruptcy Court for the Southern District of New York, but, on May 13, 2011, by motion of objecting creditors, venue was transferred to the United States Bankruptcy Court for the Northern District of Texas. Because Sanchez-Mujica could not leave Mexico—a result of certain travel restrictions imposed by the Mexican court because of his role in Vitro's restructuring—Vitro filed a supplemental petition to recognize Javier Arechavaleta-Santos, another appointee of Vitro's

---

[6] Wilmington and other creditors then sought a temporary restraining order directing the Guarantors to withdraw their consent to the *Concurso* plan. The state court granted the TRO, but that order was stayed by the bankruptcy court on the basis that the TRO interfered with Vitro's rights in a lockup agreement between it and its subsidiaries, and the *concurso* proceeding. That order was separately appealed and is before another panel of this court, Case No. 11-11239.

Objecting creditors also took further legal action to resist Vitro's reorganization efforts, including involuntary *concurso* proceedings in Mexico.

[7] This filing actually constituted Vitro's second filing of a petition for recognition under Chapter 15. Vitro first filed such a petition on December 14, 2010, but, by agreement of the parties, withdrew that petition after the Mexican court initially denied Vitro's entry into *concurso mercantil*.

Board of Directors, as "co-foreign representative."[8]  The bankruptcy court, over objections, held that the Mexican reorganization proceeding was a "foreign main proceeding" and approved the petition confirming Sanchez-Mujica and Arechavaleta-Santos as foreign representatives pursuant to 11 U.S.C. § 1515 and § 1517.[9]  The United States District Court for the Northern District of Texas affirmed the bankruptcy court's order.  *In re Vitro, S.A.B. de C.V.*, 470 B.R. 408 (N.D. Tex. 2012) (*Vitro I*).  That decision has been appealed, Case No. 12-10542, and is one of the cases consolidated in this appeal.

On March 2, 2012, Vitro's foreign representatives filed a motion in bankruptcy court entitled "Motion of Foreign Representatives of Vitro S.A.B. de C.V. for an Order Pursuant to 11 U.S.C. §§ 105(a), 1507 and 1521 to (I) Enforce the Mexican Plan of Reorganization of Vitro S.A.B. de C.V., (II) Grant a Permanent Injunction, and (III) Grant Related Relief" (the "Enforcement Motion").  The Noteholders, Wilmington, and U.S. Bank (collectively, the "Objecting Creditors") objected, and the matter proceeded to trial on June 4, 2012.  Following a four-day trial, in which hundreds of exhibits were presented and several witnesses testified, the bankruptcy court denied the Enforcement Motion.  *In re Vitro, S.A.B. de C.V.*, 473 B.R. 117 (Bankr. N.D. Tex. 2012) (*Vitro II*).  As part of that ruling, the court also denied Vitro's motion to enjoin the Objecting Creditors from initiating litigation against the Guarantors.[10]  To

---

[8] The travel restrictions on Sanchez-Mujica were later lifted, permitting him to travel to the United States and testify at trial.

[9] A "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests,"  11 U.S.C. § 1502(4), and is to be distinguished from a foreign nonmain proceeding, which is "a foreign proceeding . . . pending in a country where the debtor has an establishment," *id.* § 1502(5).  Depending on whether a proceeding is a foreign main or a foreign nonmain, certain Chapter 15 relief will be automatic or discretionary.  *See In re Ran*, 607 F.3d 1017, 1026 (5th Cir. 2010).

[10] Previously, on June 24, 2011, the bankruptcy court had issued a preliminary injunction in Vitro's favor to protect its assets, but denied such relief as to the guarantors.

permit Vitro time to appeal, the bankruptcy court did, however, extend a previously issued temporary restraining order. Vitro and Fintech have appealed the bankruptcy court's decision, which has been certified for direct appeal, and Case Nos. 12-10689 (Vitro's appeal) and 12-10750 (Fintech's appeal) were subsequently consolidated with the other case before us.[11]  Vitro subsequently sought, and was granted on June 28, 2012, an order by this court staying the expiration of the bankruptcy court's temporary restraining order.

## II.  STANDARD OF REVIEW

We review a district court's affirmance of a bankruptcy court's decision by applying the same standard of review that the district court applied.  *In re Martinez*, 564 F.3d 719, 725-26 (5th Cir. 2009).  Accordingly, questions of fact are reviewed for clear error and conclusions of law are reviewed de novo.  *Id.* at 726. Mixed questions of law and fact are reviewed de novo.  *In re McLain*, 516 F.3d 301, 307 (5th Cir. 2008).  We review a bankruptcy court's decision on direct appeal under the same standards.  By contrast, "[w]e review a denial of declaratory or injunctive relief for abuse of discretion." *In re Schimmelpenninck*, 183 F.3d 347, 353 (5th Cir. 1999).  A court's decision to grant comity is also reviewed for abuse of discretion. *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593 (5th Cir. 2003) (applying abuse of discretion standard to review district court's grant of comity to Mexican bankruptcy court's ex parte order); *see also In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 556 (E.D. Va. 2010).

## III.  CHAPTER 15

The dispute before us arises under Chapter 15 of the Bankruptcy Code and broadly involves two issues: recognition of the foreign representatives and

---

[11] Although brought under separate case numbers, the only substantive difference between the cases is that Vitro is the appellant in Case No. 12-10689, while Fintech is the appellant in Case No. 12-10750.

enforcement of the *Concurso* plan. As to the first, on April 14, 2011, Sanchez-Mujica and Arechavaleta-Santos, as co-foreign representatives, filed a petition seeking recognition of the *concurso* proceeding under Chapter 15. The Noteholders objected that Sanchez-Mujica and Arechavaleta-Santos were not properly appointed as foreign representatives because they were not appointed by the Mexican court and because Vitro did not have the powers of a debtor in possession. The bankruptcy court granted recognition of the *concurso* proceeding as a foreign main proceeding under 11 U.S.C. § 1517. On appeal, the district court affirmed, holding that it was sufficient that Sanchez-Mujica and Arechavaleta-Santos were authorized as co-foreign representatives in the context of a foreign bankruptcy proceeding and that Vitro retained sufficient control over its business to be a debtor in possession. The Noteholders appeal, raising substantially the same arguments before us that they raised in the lower courts.

Because recognition of a proceeding under Chapter 15 is a precondition for the more substantive relief Vitro seeks in the Enforcement Motion, we will resolve the recognition issue first. We hold that the bankruptcy court and the district court correctly interpreted Chapter 15 as not requiring official court appointment. We further find that the term "foreign representatives" was intended to include debtors in possession, including those that may not meet Chapter 11's definition of debtors in possession, and that Vitro retained enough authority over its affairs to be a debtor in possession and could thus appoint Sanchez-Mujica and Arechavaleta-Santos as foreign representatives. Accordingly, we affirm the district court's ruling affirming the bankruptcy court's order.

We then address the Enforcement Motion. On March 2, 2012, Vitro's co-foreign representatives filed a motion seeking "to 1) give full force and effect in the United States to the *Concurso* Approval Order, 2) grant a permanent

13

injunction prohibiting certain actions in the United States against Vitro SAB, as well as its non-debtor subsidiaries, and 3) grant certain related relief." *Vitro II*, 473 B.R. at 120-21 (quotation marks omitted). The bankruptcy court denied relief under 11 U.S.C. §§ 1507, 1521, and 1506 because approval of the Plan would extinguish claims held by the Objecting Creditors against the subsidiaries. *Id.* at 131. Vitro and Fintech appeal this decision solely on the issue of whether the bankruptcy court erred as a matter of law in refusing to enforce the *Concurso* plan because the Plan novated guaranty obligations of non-debtor parties. While the relief available under Chapter 15 may, in exceptional circumstances, include enforcing a foreign court's order extinguishing the obligations of non-debtor guarantors, Vitro has failed to demonstrate that comparable circumstances were present here. Because Vitro has not done so, we affirm the bankruptcy court's decision denying the Enforcement Motion.

## A.      Chapter 15 of the United States Bankruptcy Code

This case concerns a foreign bankruptcy proceeding for which recognition and enforcement are sought under Chapter 15 of the United States Bankruptcy Code. Chapter 15 was enacted in 2005 to implement the Model Law on Cross-Border Insolvency ("Model Law") formulated by the United Nations Commission on International Trade Law ("UNCITRAL"), and replaced former 11 U.S.C. § 304.[12] *See In re Ran*, 607 F.3d at 1020; *In re Iida*, 377 B.R. 243, 256 (B.A.P. 9th

---

[12] As Professor Jay Lawrence Westbrook has previously explained, the Model Law, along with the European Union Insolvency Regulation ("EU Regulation"), and the American Law Institute's Principles of Cooperation in Transnational Insolvency Cases Among Members of the North American Free Trade Agreement ("ALI Principles"), was a response to international trade and "the growth of multinational enterprise," as well as "the increased incidence of multinational financial failure." Jay Lawrence Westbrook, *Multinational Enterprises in General Default: Chapter 15, the ALI Principles, and the EU Insolvency Regulation*, 76 Am. Bankr. L.J. 1, 1-2 (2002). Of the three, the EU Regulation "served as the source of some of the key concepts adopted in both the Model Law and the ALI Principles." *Id.* at 2. The ALI Principles, by contrast, were the last to be approved, and thus "in some important respects represent the next generation of reform." *Id.*

Cir. 2007).[13]  It was intended "to provide effective mechanisms for dealing with cases of cross-border insolvency,"  11 U.S.C. § 1501(a), as well as to be "the exclusive door to ancillary assistance to foreign proceedings," thus "concentrat[ing] control of these questions in one court."  H.R. Rep. No. 109-31, pt. 1, at 110 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 178.  It was also intended to increase legal certainty, promote fairness and efficiency, protect and maximize value, and facilitate the rescue of financially troubled businesses.  11 U.S.C. § 1501(a).

Central to Chapter 15 is comity.  Comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  "It is not a rule of law, but one of practice, convenience, and expediency."  *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1148 (5th Cir. 1990) (quotation marks and citation omitted).  Within the context of Chapter 15, however, it is raised to a principal objective.  Section 1501(a) begins by listing, as one of Chapter 15's goals, the furtherance of cooperation between domestic and foreign courts in cross-border insolvency cases.  Section 1508 goes on to provide that Chapter 15's provisions shall be interpreted by considering "its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.  Comity considerations are explicitly included in the introduction to

---

[13] While § 304 has been replaced by Chapter 15, caselaw applying that section remains relevant to evaluating requests for relief.  *See In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009); Leif M. Clark & Karen Goldstein, *Sacred Cows: How to Care for Secured Creditors' Rights in Cross-Border Bankruptcies*, 46 Tex. Int'l L.J. 513, 524 (2011) ("Not surprisingly, the case law under former § 304 is still relevant to the interpretation of Chapter 15, especially as it concerns the remedies available to a foreign representative once recognition has been granted.").

§ 1507, and § 1509(b)(3) further provides that our courts "shall grant comity or cooperation to the foreign representative" of a foreign proceeding.

Such a foreign representative must first petition a United States bankruptcy court for recognition of a foreign proceeding. 11 U.S.C. §§ 1504, 1515. Chapter 15 defines such a foreign proceeding as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Only after a United States court recognizes a proceeding can "the foreign representative . . . apply directly to a court in the United States for appropriate relief in that court." 11 U.S.C. § 1509(b)(2); *see also United States v. J.A. Jones Constr. Grp., LLC*, 333 B.R. 637, 638 (E.D.N.Y. 2005).

Chapter 15 provides for a broad range of relief. This includes the ability to sue and be sued in United States courts, to apply directly to a United States court for relief, to commence a non-Chapter 15 case, and to intervene in any United States case to which the debtor is a party. *In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010). Section 1520 also provides for certain automatic relief upon recognition of a foreign main proceeding, like the one here, including an automatic stay and the power to prevent transfers of the debtor's property. A bankruptcy court is also empowered under § 1521(a) to "grant any appropriate relief" necessary to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." Finally, § 1507(a) gives a court authority to provide "additional assistance," subject to certain restrictions imposed by Chapter 15 and § 1507(b).

In considering whether to grant relief, it is not necessary that the result achieved in the foreign bankruptcy proceeding be identical to that which would be had in the United States.  It is sufficient if the result is "comparable."  *In re Schimmelpenninck*, 183 F.3d at 364; *Overseas Inns*, 911 F.2d at 1149; *see also In re Sivec SRL*, 476 B.R. 310, 324 (Bankr. E.D. Okla. 2012) ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity."); *In re Qimonda AG*, 462 B.R. 165, 184 n.17 (Bankr. E.D. Va. 2011); *In re Petition of Garcia Avila*, 296 B.R. 95, 112 (Bankr. S.D.N.Y. 2003).  "[T]he foreign laws need not be identical to their counterparts under the laws of the United States; they merely must not be repugnant to our laws and policies."  *In re Schimmelpenninck*, 183 F.3d at 365.

But as discussed, whether any relief under Chapter 15 will be granted is a separate question from whether a foreign proceeding will be recognized by a United States bankruptcy court.  The consolidated cases before us arise from decisions addressing each of these issues.  We first turn to whether Vitro's co-foreign representatives were properly recognized.

## B.    Recognition of Foreign Representatives

After initiation of a foreign bankruptcy proceeding, a "foreign representative" may petition a United States court to recognize the proceeding under Chapter 15.  Chapter 15 defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).  "A federal court's recognition of representatives appointed in the course of a foreign bankruptcy or liquidation proceeding is a matter of comity—it is an acknowledgment of the validity of the foreign proceeding."  *Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.*, No. 09 Civ. 9021(PGG), 2010 WL 1779282, at *5 (S.D.N.Y. Apr. 29, 2010) (citing *Finanz AG Zurich v.*

17

Nos. 12-10542, 12-10689, 12-10750

*Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)). A duly recognized foreign representative has the capacity to sue and be sued in the United States and to apply directly to a United States court for relief, and a foreign representative is entitled to the comity and cooperation of all United States courts. 11 U.S.C. § 1509.

Three requirements, contained in § 1517, must be met before a foreign proceeding will be recognized:

> (a)  Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--
>> (1)  such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>> (2)  the foreign representative applying for recognition is a person or body; and
>> (3)  the petition meets the requirements of section 1515.

11 U.S.C. § 1517.

Section 1515, in turn, provides the following procedural requirements:

> (a)  A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
> (b)  A petition for recognition shall be accompanied by--
>> (1)  a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
>> (2)  a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
>> (3)  in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of

Nos. 12-10542, 12-10689, 12-10750

> such foreign proceeding and of the appointment of the foreign representative.
>
> (c)   A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.
>
> (d)   The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515.

These requirements are to be strictly construed in line with our holding that the requisite analysis is not a "rubber stamp exercise," and that "[e]ven in the absence of an objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant." *In re Ran*, 607 F.3d at 1021.

Neither Sanchez-Mujica nor Arechavaleta-Santos, the recognized foreign representatives in this case, was appointed by a foreign court or tribunal. Both were voted into their positions by Vitro's Board of Directors. The bankruptcy court recognized the *concurso* proceeding under Chapter 15 and the district court affirmed, holding that whether a given individual could act as a foreign representative was a matter of United States law, and that it was unnecessary for a foreign representative to be appointed by a court. The court's holding rested on its analysis of § 101(24)'s language and cases applying that subsection, which showed that it was sufficient for a foreign representative to be authorized in the context of a foreign bankruptcy proceeding. *Vitro I*, 470 B.R. at 411-13. The district court further determined that Vitro was the Mexican equivalent of a "debtor in possession," able to administer its own reorganization, and was thus able to appoint a foreign representative under Chapter 15. *Id.* at 412.[14]

---

[14] The district court was skeptical of whether Sanchez-Mujica and Arechavaleta-Santos, as co-foreign representatives, could properly constitute a person or body under 11 U.S.C.

Nos. 12-10542, 12-10689, 12-10750

On appeal, the Noteholders argue that the individuals appointed here do not satisfy Chapter 15's definition of "foreign representatives" for two reasons. First, neither was "authorized in a foreign proceeding," because neither was appointed by a foreign court or administrative tribunal. 11 U.S.C. § 101(24). In support, the Noteholders rely on § 101(23)'s definition of "foreign proceeding," as well as 11 U.S.C. §§ 1515(a), 1515(b)(1)-(2), and 1509(b)(2). Second, the Noteholders argue that even if Chapter 15 did not require such an appointment, the foreign representatives still did not qualify for their positions because they did not have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

Vitro responds that the plain language of § 101(24) does not require court appointment and that this conclusion is support by both Chapter 15's legislative history and UNCITRAL's Model Law. Vitro further argues that § 101(24) was intended to apply to a "debtor in possession," like Vitro, and thus it had the power to appoint individuals as foreign representatives of the *concurso* proceeding.

Because the district court correctly interpreted § 101(24), defining foreign representatives as having been appointed in the context of a foreign proceeding, and because Vitro, as a debtor in possession, met the requirements of that subsection, we affirm the district court's decision. We address each of these points in turn.

---

§ 101(24) and § 1517(a)(2). *Vitro I*, 470 B.R. at 410 n.*. The source for this skepticism is unclear, and neither the parties nor the district court explores the matter further. Because § 101(41) provides that "[t]he term 'person' includes individual, partnership, and corporation," there is little doubt that Sanchez-Mujica and Arechavaleta-Santos, both natural persons, qualify as a "person or body." This is especially so because the Bankruptcy Code utilizes the word "includes" in a non-limiting capacity. 11 U.S.C. § 102(3). This means that § 101(41) potentially includes an even broader range of entities. *See In re Oversight & Control Comm'n of Avanzit, S.A.*, 385 B.R. 525, 540 (Bankr. S.D.N.Y. 2008) (holding oversight commission was person or body within meaning of § 1517(a)).

### 1.    Authorized in a Foreign Proceeding

The Noteholders point to numerous parts of Chapter 15 that allegedly show that a foreign court must explicitly authorize individuals or bodies to act as representatives.  Contrary to the Noteholders' interpretation, we do not find that any of Chapter 15's provisions requires action by a foreign tribunal.

We interpret statutes according to their plain meaning. *Gaddis v. United States*, 381 F.3d 444, 472 (5th Cir. 2004).  Section 101(24)—defining the term "foreign representative"—is wholly devoid of any statement that a foreign representative must be judicially appointed.  The definition's requirement that a representative be "authorized in a foreign proceeding" is certainly compatible with appointment by a foreign court, but it is hardly necessary.  As the district court observed, it would be equally compatible with a requirement that an individual be appointed "in the context of" a foreign proceeding.  *Vitro I*, 470 B.R. at 411.  It could also mean during, or in the course of, a foreign proceeding.

The other provisions the Noteholders identify suffer from the same defect.  Section 1515(a) provides that "[a] foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed" and requires that a petition for recognition be accompanied by, either, 1) "a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative," 2) "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative," or 3) other evidence "of such foreign proceeding and of the appointment of the foreign representative."  11 U.S.C. § 1515.  None of these provisions states who has the official authority to appoint a foreign representative.    At best, they provide the context in which a foreign representative should be appointed.  By comparison, § 1509(b)(2) states that if a court grants recognition to a foreign proceeding, it shall grant "comity or cooperation" to the foreign representative.  Although use of the word "comity"

connotes recognition of another judicial proceeding, the word "cooperation" suggests a much broader meaning.

Caselaw supports our interpretation. To be sure, foreign representatives have been appointed by foreign tribunals in many cases. One such case was *In re Grand Prix Associates, Inc.*, where the court specifically held that § 1517(a) was satisfied where the purported foreign representative was able to present an order by the foreign court appointing it as the foreign representative of the business entities in question. No. 09-16545 (DHS), 2009 WL 1410519, at *5 (Bankr. D.N.J. May 18, 2009); *see also In re Innua Canada Ltd.*, No. 09-16362 (DHS), 2009 WL 1025090, at *4-5 (Bankr. D.N.J. Apr. 15, 2009) (receivership order entered by Canadian court stated foreign representative had capacity to commence Chapter 15 proceeding); *In re Oversight*, 385 B.R. at 534 (Spanish insolvency court had power to appoint foreign representative for Chapter 15 purposes); *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 46 n.30 (Bankr. S.D.N.Y. 2008); *In re Tri-Cont'l Exch. Ltd.*, 349 B.R. 627, 632 (Bankr. E.D. Cal. 2006). But the district court identified numerous cases cited by the bankruptcy court that, although not binding, demonstrate that recognition is routinely granted to petitioners appointed by Mexican debtors to serve as foreign representatives. *Vitro I*, 470 B.R. at 412 (listing cases).[15]

The Mexican court's actions make it equally apparent that Sanchez-Mujica and Arechavaleta-Santos were properly appointed. It is undisputed that the Mexican court had the power to enjoin Sanchez-Mujica and Arechavaleta-Santos from acting as foreign representatives. Yet, when presented with a motion

---

[15] The Noteholders point out that none of these decisions entailed a challenge to the foreign representatives' appointment. While correct, in the context of the issue above, this fact does not diminish their persuasive value. Assuming the Noteholders' interpretation was correct, and a foreign representative had to show it was appointed by a foreign tribunal to receive Chapter 15 relief, it would be irrelevant whether another party objected because the court would still need to determine whether the appointment was correct as a threshold matter prior to granting recognition. *See In re Ran*, 607 F.3d at 1021.

requesting such an order, the Mexican court denied it in full. The Mexican court also refused to declare the *conciliador* to be the only person authorized to act as foreign representative. In deciding not to enjoin the foreign representatives' conduct, the Mexican court gave the representatives its tacit approval.[16]

Finally, our decision is informed by consideration of the Model Law, and reports by the UNCITRAL Working Group on Insolvency Law ("Working Group"). 11 U.S.C. § 1501(a) (purpose of Chapter 15 is to incorporate the Model Law); *see also In re Tri-Cont'l Exch. Ltd.*, 349 B.R. at 633 (treating as persuasive authority the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency); *In re Condor*, 601 F.3d at 326-27 & nn.37-40 (discussing and citing Working Group).

The definition of foreign representatives in § 101(24) closely follows the language of Model Law Article 2(d).[17] In drafting this definition, the Working Group expressly rejected the requirement that a foreign representative be "[specifically] authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding." UNCITRAL Rep. of the Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995), *available at* http://www.uncitral.org/uncitral/en/commission/working_groups/ 5Insolvency.html (Dec. 1995 Rep.) (alteration in original). That definition was

---

[16] The *conciliador* also submitted a letter to the bankruptcy court, as a party in interest, to the effect that he agreed with the appointment of Sanchez-Mujica and Arechavaleta-Santos.

[17] Article 2(d) provides that a foreign representative is "a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding." UNCITRAL, UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment, art. 2(d) (1997), *available at* http://www.uncitral.org/pdf/ english/texts/insolven/insolvency-e.pdf (Model Law Guide). The only change in 11 U.S.C. § 101(24) is the addition of the words "including a person or body appointed," in lieu of the original "including one appointed."

rejected because of concerns that "the expressions would be unfamiliar and might have the unintended effect of being unduly restrictive, since the list would inevitably be incomplete." *Id.* ¶ 112. The Working Group also declined to include the word "specifically" because "it would be unusual for a State to appoint an insolvency representative specifically to act abroad." *Id.* ¶ 113. This supports our conclusion that the Noteholders' proposed interpretation—which would require exactly such an appointment—is wrong.[18]

Accordingly, we conclude that Sanchez-Mujica and Arechavaleta-Santos are not disqualified from serving as foreign representatives merely because they were not the subject of an official court-appointment.

### 2. Power to Administer the Reorganization or Liquidation of a Debtor's Assets or Affairs

Having determined that Chapter 15 does not require a foreign representative to be appointed by court order, we still must address whether Sanchez-Mujica's and Arechavaleta-Santos' appointments comport with the remainder of § 101(24). In particular, § 101(24) requires that a foreign representative have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Vitro does not argue that Sanchez-Mujica and Arechavaleta-Santos have the authority to represent the *concurso* proceeding, and we therefore do not address that prong of § 101(24).[19] The only remaining question is whether they had administrative power over the reorganization of Vitro's business.

---

[18] For the same reason, we are not persuaded by the Noteholders' argument that their interpretation would result in a more objective and predictable appointment process.

[19] The Noteholders argue that our understanding of § 101(24) would allow parties to appoint competing foreign representatives, but that concern is invalid. The number of parties who are authorized to "administer the reorganization of a debtor's assets" is necessarily limited. As we have said, we do not opine on the limits of authorization to "act as a representative," because that issue is not pertinent here.

Nos. 12-10542, 12-10689, 12-10750

The district court held that Vitro could appoint its own foreign representatives because, under Mexican law, a debtor continues to manage its business during a *concurso* proceeding, making it akin to a "debtor in possession." *Vitro I*, 470 B.R. at 412.[20] The Working Group clearly intended to include foreign representatives of proceedings in which a debtor in possession remains in control of its assets. Dec. 1995 Rep. ¶ 115. The National Bankruptcy Review Commission, created by Congress in 1994 to make recommendations on improving bankruptcy law and procedure, in its review of the Model Law, reached the same conclusion. Nat'l Bankr. Rev. Comm'n, *Bankruptcy: The Next Twenty Years, Nat'l Bankr. Rev. Comm'n Final Rep.*, (1997), *available at* http://govinfo.library.unt.edu/nbrc/reportcont.html (Nat'l Bankr. Comm'n).

The Noteholders, however, challenge whether Vitro can be classified as a debtor in possession, and argue that such power is reserved for the *conciliador* in a *concurso* proceeding. The Noteholders also point out that under Chapter 11, a debtor in possession has the rights, powers, and duties of a Chapter 11 trustee, which include the right to negotiate, file, and seek confirmation of a plan of reorganization, and that Vitro lacked this authority.[21]

The Noteholders' argument fails for relying exclusively on Chapter 11's

---

[20] Under Chapter 11, the term "debtor in possession" refers to the debtor itself, unless an entity is serving as the debtor's trustee pursuant to 11 U.S.C. § 322. "A debtor in possession stands in the shoes of the bankruptcy trustee, generally having the same rights, powers, duties and functions, with certain exceptions." *Soto-Rios v. Banco Popular de Puerto Rico*, 662 F.3d 112, 115 n.2 (1st Cir. 2011) (citing 11 U.S.C. § 1107(a)).

[21] The Noteholders raise a number of additional arguments that are ultimately unavailing. The Noteholders argue that, assuming Vitro could act as its own foreign representative, it could not appoint others to that role. The Noteholders also argue that Vitro's appointment fails because it occurred prior to the *concurso* filing and because the appointment creates a conflict of interest between Vitro and its creditors. Finally, they repeatedly point out that the foreign representatives lacked the expertise necessary to serve in that role, and that they abdicated their responsibilities by ceding decision-making authority to United States counsel. The Noteholders cite no pertinent authority in support of these contentions.

definition of a debtor in possession.  The Working Group's decision to include debtors in possession was not made on the basis of how United States law defined the term.  Rather, the Working Group understood debtors in possession to include those cases "in which the debtor remained in control of its assets and could technically be regarded as exercising administration type of functions, although under the supervision of a judicial or administrative authority."  Dec. 1995 Rep. ¶ 115.  The UNCITRAL Practice Guide on Cross-Border Insolvency Cooperation similarly defines debtor in possession to mean "a debtor in reorganization proceedings, which retains full control over the business, with the consequence that the court does not appoint an insolvency representative." UNCITRAL, Practice Guide on Cross-Border Insolvency Cooperation 5 (July 1, 2009), *available at* http://www.uncitral.org/pdf/english/texts/insolven/ Practice_Guide_Ebook_eng.pdf.  At least one court has understood foreign representatives to include debtors in possession, including those in "debtor-in-possession reorganization proceedings in Latin American countries."  *In re Cenargo Int'l, PLC*, 294 B.R. 571, 598 n.31 (Bankr. S.D.N.Y. 2003) (internal quotation marks and citation omitted).  We likewise hold that under Chapter 15 the correct analogy is not to whether a debtor meets Chapter 11's definition of a "debtor in possession," but whether it meets that definition originally envisioned by the drafters of the Model Law and incorporated into § 101(24). *See* 11 U.S.C. § 1508 (Chapter 15 to be interpreted by consideration of its international origin, and consistent with application of similar foreign statutes); Nat'l Bankr. Comm'n, *supra*, at 357 (definitions in Model Law are "carefully constructed to include the United States Chapter 11 proceeding (and similar debtor in possession reorganization proceedings in Latin America and elsewhere)").

Here, there is little doubt that Vitro met that definition.  Vitro has presented extensive evidence that it retained broad control over its affairs,

pursuant to various provisions of the LCM.  *See* Ley de Concursos Mercantiles [LCM] [Bankruptcy Law], Diario Oficial de la Federación [DO], *as amended*, 12 de mayo de 2000, art. 74 (debtor will be entrusted with enterprise's management throughout conciliation stage unless court grants *conciliador's* request to remove debtor to protect the estate); *Id.* art. 84 (debtor retains ability to litigate pending claims under *conciliador's* supervision).  Commentary on the LCM agrees that a board of directors generally remains in control and possession of its business during a *concurso* proceeding.  *See* Jonathan Graham-Canedo, *Comparative Analysis of Bankruptcy Legal Provisions from Mexico and the United States: Which Legal System is More Attractive?*, 6 DePaul Bus. & Com. L.J. 19, 27 (Fall 2007).

We further observe that if Vitro were not permitted to proceed as a debtor in possession, with the power to appoint foreign representatives, it is unclear who would.  Any other potential candidate would be susceptible to the same attacks raised by the Noteholders.  For example, in a *concurso* proceeding the *conciliador* acts as mediator between the debtor and creditors.  A *visitador* only inspects the debtor's accounting books and records and determines whether the debtor meets the LCM's liquidity standard.   The *sindico* is a receiver charged with liquidating the business and selling its assets if a plan is not reached within a specific period of time.  None of these individuals possesses the full authority the Noteholders argue is required under § 101(24).

Accordingly, we conclude that Vitro had the powers of a debtor in possession for purposes of § 101(24) and affirm the district court's decision affirming the bankruptcy court's order that Sanchez-Mujica and Arechavaleta-Santos are properly appointed foreign representatives under Chapter 15.

## C.    Enforcement of the Plan

### 1.    Vitro's Request for Relief

In the Enforcement Motion, Vitro sought broad relief pursuant to 11 U.S.C. §§ 105(a), 1507, and 1521.  Specifically, Vitro sought an order giving full force and effect in the United States to the Mexican court's order approving the *Concurso* plan.  Vitro further sought a permanent injunction prohibiting certain actions in the United States against itself and its non-debtor subsidiaries, specifically:

> [A] permanent injunction enjoining all persons from initiating or continuing any suit, action, extra-judicial proceeding or other proceeding (including [already commenced actions in New York state court]) or any enforcement or collection process (including pursuant to any judgment, notices of attachment or [levies, restraining notices, or similar documentation]) in any jurisdiction within the United States or its territories . . . against Vitro SAB and/or the Old Guarantors . . . or their Property . . . except as permitted under the *Concurso* Plan or the *Concurso* Approval Order . . . .

If Vitro were to succeed in obtaining all the relief that it requested, actions, executions, attachments, or other collection or enforcement processes currently pending against Vitro or its subsidiaries would be "permanently stayed, suspended, discharged, and dismissed."  Judgments already rendered against it or its subsidiaries would be declared "null and void and of no further force or effect."  Moreover, any entity having withheld payment to Vitro or its subsidiaries as a result of Vitro's default would immediately remit such payments to the applicable party.  Finally, Vitro and its subsidiaries would be released from all liabilities with respect to any claims discharged under the *Concurso* plan.  Of course, the bankruptcy court could grant some, but not all, of the relief requested.

The bankruptcy court held that the *Concurso* plan "which extinguishes the

guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro, should not be accorded comity to the extent it provides for the extinguishment of the non-debtor guarantees of the indentures." *Vitro II*, 473 B.R. at 132.   The bankruptcy court specifically denied enforcement under §§ 1507, 1521, and 1506.   It denied relief under § 1507 because the Mexican court's approval order did "not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11 [of the Bankruptcy Code]." *Id.* "The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off." *Id.* Relief under § 1521 was inappropriate because the Mexican court's approval order "neither sufficiently protects the interests of creditors in the United States, nor does it provide an appropriate balance between the interests of creditors and Vitro SAB and its non-debtor subsidiaries." *Id.* Finally, the relief sought would not be allowed under Chapter 15 because "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and "the *Concurso* plan does not recognize and protect such rights." *Id.*

The circumstances under which the Plan was approved and the treatment creditors received raise many questions that are not before us about whether such a plan could be enforced under Chapter 15.   The bankruptcy court explicitly dealt with some of these questions, while flagging others for our consideration without itself reaching them.   Thus, for example, the bankruptcy court considered whether, as alleged by the Objecting Creditors, the Mexican judicial system and the *concurso* proceeding were corrupt, and should not be granted comity for this reason.  Addressing the Objecting Creditors' expert—Dr. Stephen D. Morris—who testified to a series of "suspicious circumstances" and "red flags"

in the *concurso* proceeding, the bankruptcy court held that, although the witness was knowledgeable and qualified to speak on corruption in Mexico generally, his analysis of what impact such corruption had on this proceeding was unpersuasive. The bankruptcy court therefore concluded that it "ha[d] not seen evidence that the Mexican Proceeding [was] the product of corruption, or that the LCM itself is a corrupt process," and rejected the Objecting Creditors' argument. *Id.* at 130. The bankruptcy court reached a similar conclusion as to whether, as argued by the Objecting Creditors, enforcement would have an adverse impact on credit markets. The court ultimately concluded that, while testimony by Dr. Elaine Buckberg, a former economist at the International Monetary Fund, was credible, her testimony did not quantify the negative effects of enforcing the Plan, and thus the court could not conclude that enforcement would adversely affect credit markets. *Id.* The bankruptcy court also considered, but rejected, the argument that relief should not be granted because the Mexican proceeding was "unfair." *Id.* at 130-31. The bankruptcy court observed that although there had been ex parte meetings, such meetings were had by both sides and were, in fact, common in Mexico. *Id.* at 131. Responding to the Objecting Creditors' allegations that they were not permitted to raise certain arguments in the Mexican court and that the *conciliador* was biased, the bankruptcy court held that such arguments were better left for the Mexican court system.[22] *Id.*

The bankruptcy court did not reach two other arguments it described as "[p]ossibl[y] [m]eritorious [o]bjections." *Id.* at 132. These were that insiders were allowed to vote in favor of the Plan, and that the *Concurso* plan violates the

---

[22] The Objecting Creditors' briefs reiterate many of the factual allegations they made in the bankruptcy court, without addressing the bankruptcy court's holdings on those allegations. Because we affirm the bankruptcy court's ultimate holding denying enforcement to the Plan, we do not address those allegations further.

absolute priority rule. Other arguments the bankruptcy court did not explicitly address, but which might be subsumed under its other holdings, are that the *Concurso* plan imposed a kind of "death trap" provision that precluded non-consenting creditors from recovering anything. Another such argument is that Mexico's single-class voting made no distinctions between creditors with adverse interests. Finally, a third such argument challenges the propriety of Vitro's orchestrating a balance transfer of several billion dollars between itself and its subsidiaries, turning those subsidiaries into creditors, prior to entering into the *concurso* proceeding and failing promptly to disclose the existence of these newly minted insider creditors.

We need not concern ourselves with the vast majority of these issues, as Vitro and Fintech have framed their appeal in terms of only one:

> Whether the Bankruptcy Court erred as a matter of law when, after it concluded that the *Concurso* Approval Order was the product of a process that was not corrupt or unfair to the Appellees, it refused to enforce the *Concurso* Approval Order solely because the *Concurso* plan novated guarantee obligations of non-debtor parties and replaced them with new obligations of substantially the same parties?

The issue Vitro and Fintech identify underpins the bankruptcy court's entire opinion. As that court summarized, "the *Concurso* plan approved in this instance . . . extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro . . . . Such order manifestly contravenes the public policy of the United States and is also precluded from enforcement under §§ 1507, 1521 and 1522 of the Bankruptcy Code," and would not be accorded comity. *Id.* at 133.

**2.    Chapter 15's Framework for Granting Relief**

As already discussed, "[a] central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings." *In re Cozumel Caribe, S.A. de C.V.*, --- B.R. ----, 2012 WL 5508303 (Bankr. S.D.N.Y. Nov. 14, 2012). "The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the comity of nations.'" *Hilton*, 159 U.S. at 164. In applying the principles of comity, we "take[ ] into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Artimm, S.r.L.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005). Accordingly, Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333-34 (S.D.N.Y. 2008); *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("[C]hapter 15 maintains—and in some respects enhances—the 'maximum flexibility,' that section 304 provided bankruptcy courts . . . in light of principles of international comity and respect for the laws and judgments of other nations." (citation omitted)).

Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law. *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) ("The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical."); *see also Artimm*, 335 B.R. at 160 n.11. We have previously cautioned that the mere fact that a foreign representative requests relief that would be

available under the law of the foreign proceeding, but not in the United States, is not grounds for denying comity. *See In re Condor*, 601 F.3d at 327.

Nevertheless, Chapter 15 does impose certain requirements and considerations that act as a brake or limitation on comity, and preclude granting the relief requested by a foreign representative. In this case, the bankruptcy court rested on three of Chapter 15's sections, §§ 1521, 1507, and 1506, each of which it found precluded the relief Vitro sought. *Vitro II*, 473 B.R. at 133. Vitro's appeal predominantly rests on finding relief under § 1507 and, only in the alternative, under § 1521. Vitro argues that it would be inappropriate to deny its request for comity under § 1507, simply because the relief might not meet the requirements of § 1521. The Objecting Creditors, in turn, argue extensively that the relief Vitro requests, to the extent it is available at all, must fall under § 1521(a)(1) and (b), and that the bankruptcy court was correct to deny enforcement because of the limitations imposed by § 1522.

Thus, while comity should be an important factor in determining whether relief will be granted, we are compelled by the bankruptcy court's decision and the parties' arguments to get into the weeds of Chapter 15 to determine whether a foreign representative may independently seek relief under either § 1521 or § 1507, and whether a court may itself determine under which of Chapter 15's provision such relief would fall. Both appear to be questions of first impression.

We conclude that a court confronted by this situation should first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider whether the requested relief falls more generally under § 1521's grant of any appropriate relief. We understand "appropriate relief" to be relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was

not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.[23]

We start by acknowledging that "[t]he relationship between § 1507 and § 1521 is not entirely clear." *In re Toft*, 453 B.R. at 190; *see also In re Atlas Shipping A/S*, 404 B.R. at 741.[24] This leaves litigants uncertain as to which provision they should rely on for relief. Indeed, Vitro itself acknowledges that its decision to seek relief under § 1507 and, only in the alternative, § 1521 was motivated, in part, by the fact that every other foreign representative requesting enforcement of a *concurso* plan under Chapter 15 has cited both § 1507 and § 1521.

Section 1521(a) empowers a court to "grant any appropriate relief" at the request of the foreign representative when necessary to "effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). In addition, § 1521 lists a series of non-exclusive forms of relief. These include:

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

---

[23] Although this approach—first considering relief under § 1521(a) and (b) and then proceeding to § 1507—has not been explicitly mandated in this circuit, this three-step approach, as we explain below, finds support in the statutory language and in Congress's express intent in crafting § 1507.

[24] *See generally* Alesia Ranney-Marinelli, *Overview of Chapter 15 Ancillary and Other Cross-Border Cases*, 82 Am. Bankr. L.J. 269, 317 (2008) ("What is not clear is whether a foreign representative can pick and choose which section to proceed under in order to take advantage of different standards for affording relief or burdens of proof."); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 455 ("Because it is unclear where section 1521 ends and where section 1507 begins, it is also unclear which of these paths the court will follow—whether it will consider entry of an order enforcing a foreign discharge as 'appropriate relief' under section 1521 or as 'additional assistance' under section 1507.").

Nos. 12-10542, 12-10689, 12-10750

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

Additionally, under § 1521(b), "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative . . . provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Section 1522 provides an important limiting factor: relief under § 1521 may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected," and a court may impose appropriate conditions on relief. 11 U.S.C. § 1522(a)-(b).

Unlike § 1521's "any appropriate relief" language, § 1507 gives courts the authority to provide "additional assistance." Section 1507 "was added to the Bankruptcy Code because Congress recognized that Chapter 15 may not anticipate all of the types of relief that a foreign representative may require and

35

Nos. 12-10542, 12-10689, 12-10750

which would otherwise be available to such foreign representative." 8 Collier on Bankruptcy ¶ 1507.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (Collier).[25] A court determining whether to provide additional assistance under § 1507 considers the factors listed under subsection (b),[26] which provides that:

> (b)    In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure
>
> 1)    just treatment of all holders of claims against or interests in the debtor's property;
>
> 2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> 3)    prevention of preferential or fraudulent dispositions of property of the debtor;
>
> 4)    distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> 5)    if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).[27]

---

[25] The Model Law's analog to § 1507 "was designed to insure access to relief that might be available under law other than the insolvency law." 8 Collier, *supra*, ¶ 1507.01.

[26] These factors are identical to those formerly found under § 304(c), with the exception that comity has been elevated from a factor to the introductory text.

[27] Because of § 1521's broad reach, § 1507's scope is uncertain. *See* Lesley Salafia, *Cross-Border Insolvency Law in the United States and Its Application to Multinational Corporate Groups*, 21 Conn. J. Int'l L. 297, 322 (2006) (section 1507 "might not have been necessary," given expansive relief available under other parts of Chapter 15); 8 Collier, *supra*, ¶ 1507.01 ("In light of this display of [§ 1521's] weaponry, it is not clear what section 1507

We are thus faced with two statutory provisions that each provide expansive relief, but under different standards. To clarify our resolution of requests for relief under Chapter 15 we adopt the following framework for analyzing such requests.

First, because § 1521 lists specific forms of relief, a court should initially consider whether the relief requested falls under one of these explicit provisions. *In re Read*, 692 F.3d 1185, 1191 (11th Cir. 2012) (specific terms prevail over the general (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)); *see also* 1 Collier, *supra*, ¶ 13.07[2]; Ranney-Marinelli, *Overview*, *supra*, at 317 (arguable that foreign representatives should be bound by those provisions specifically providing the relief sought). Other courts have held that, where the requested relief is explicitly provided for under § 1521, it is unnecessary to consider § 1507. *In re Atlas Shipping A/S*, 404 B.R. at 740 ("Whatever the outer bounds of discretionary relief chapter 15 allows, this case does not push the boundaries. The relief sought by the foreign representative is expressly provided for in §§ 1521(a)(5) and 1521(b). The Court need not venture into the area of 'additional assistance,' 'consistent with principles of comity' under § 1507."); *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 n.10 (Bankr. S.D.N.Y. 2010).

Second, if § 1521(a)(1)-(7) and (b) does not list the requested relief, a court should decide whether it can be considered "appropriate relief" under § 1521(a). This, in turn, requires consideration of whether such relief has previously been

adds to the arsenal."). Scholarly commentary has speculated that § 1507 was merely intended to incorporate § 304's jurisprudence. 8 Collier, *supra*, ¶ 1507.01. Further muddying § 1507's role is that, although § 304(c)'s factors are included under § 1507, a court may nevertheless consider those factors under § 1521. "It would be anomalous to suggest that in determining whether creditor interests are sufficiently protected for purposes of . . . [§] 1521, a court could not consider evidence of procedural or substantive prejudice to non-domestic creditors in the foreign proceeding or a significant deviation between the distribution scheme in the foreign proceeding and the distribution scheme prescribed by the Code." Paul L. Lee, *Ancillary Proceedings under Section 304 and Proposed Chapter 15 of the Bankruptcy Code*, 76 Am. Bankr. L.J. 115, 193 (2002).

provided under § 304. *See In re Condor*, 601 F.3d at 329 (observing that avoidance actions under foreign law were permitted under § 304 and reading § 1521(a)(7) to permit such relief). This latter consideration aligns with Congress's intent that § 1521 was not intended to "expand or reduce the scope of relief" previously available under other provisions, including § 304. H.R. Rep. No. 109-31, pt. 1, at 116. A court should also consider whether the requested relief would otherwise be available in the United States. *Cf. Artimm,* 335 B.R. at 160 n.11 (section 1507 authorizes relief beyond that provided for in Bankruptcy Code or United States law).

Third, only if the requested relief appears to go beyond the relief previously available under § 304 or currently provided for under United States law, *Artimm*, 335 B.R. at 160 n.11, should a court consider § 1507. *See* H.R. Rep. No. 109-31, pt. 1, at 109 ("Subsection (2) [of § 1507] makes the authority for additional relief (*beyond that permitted under section*[ ] . . . *1521*, below) subject to the conditions for relief heretofore specified in United States law under section 304 . . . ." (emphasis added)). This approach recognizes that relief under § 1507 "is in nature more extraordinary" than that provided under § 1521, as a result of which "the test for granting that relief is more rigorous." Leif M. Clark, *Chapter 15 Bankruptcy Strategies: Leading Bankruptcy Experts on Understanding the Filing Process and Achieving Successful Outcomes in Cross-Border Insolvency Cases—Advice for Handling Cross-Border Bankruptcy Cases Effectively* (Aspatore Sept. 2012), *available at* 2012 WL 3279175, at *10. It also acknowledges that, while § 1507's broad grant of assistance is intended to be a "catch-all," it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to provide relief otherwise available under other provisions. *In re Int'l Banking Corp. B.S.C.*, 439 B.R. at 626 n.10; 1 Collier, *supra*, ¶ 13.07[2] n.34 (section 1507 should not be used "to eviscerate limitations placed within chapter 15 itself").

We believe this framework provides foreign representatives with the clearest path by which to seek Chapter 15 relief. *See* Clark, *supra*, at *10 (advising attorneys to consult § 1507 if the relief under § 1521 is insufficiently broad). This framework also conforms to Congress's intent that courts should not deny Chapter 15 relief for failure to meet the requirements of § 1507, which, in any case, "is not to be the basis for denying or limiting relief otherwise available under this chapter." H.R. Rep. No. 109-31, pt. 1, at 109; *see also* Ranney-Marinelli, *Overview*, *supra*, at 316 n.267. Under this framework, courts will also "not construe the range of relief under § 1507 to be bound by the same limitations that apply in § 1521," with the exception of those limitations specifically provided for. Clark & Goldstein, *Sacred Cows*, *supra*, at 529.

At the same time, this approach means that, by first considering § 1521 relief—which we deem co-extensive with that previously available under § 304—courts begin their analysis in familiar territory. Ranney-Marinelli, *Overview*, *supra*, at 317 n.274 (noting that, compared to other sections, § 1507's standard of proof is unclear). This prevents all-encompassing applications of § 1507 and avoids prematurely expanding the reach of Chapter 15 beyond current international insolvency law. H.R. Rep. Rep. No. 109-31, pt. 1, at 109 (purpose of § 1507 is "to permit the further development of international cooperation begun under section 304"); Clark & Goldstein, *Sacred Cows*, *supra*, at 529 (whether a "court [would] ever dare to employ § 1507 as a substitute for (or worse, an end-around of) § 1521" is an open question).

### 3.    Availability of Relief under § 1521 and § 1507

Applying our analytic framework to Vitro's request for relief, the bankruptcy court did not err in denying relief. Sections 1521(a)(1)-(7) and (b) do not provide for discharging obligations held by non-debtor guarantors. Section 1521(a)'s general grant of "any appropriate relief" also does not provide the necessary relief because our precedent has interpreted the Bankruptcy Code to

foreclose such a release, and because when such relief has been granted, it has been granted under § 1507, not § 1521. Even if the relief sought were theoretically available under § 1521, the facts of this case run afoul of the limitations in § 1522. Finally, although we believe the relief requested may theoretically be available under § 1507 generally, Vitro has not demonstrated circumstances comparable to those that would make possible such a release in the United States, as contemplated by § 1507(b)(4).

(a)    Step 1: Section 1521's enumerated provisions

The bankruptcy court denied relief under § 1521(b) and § 1522(a), observing that "[o]ne could argue that Vitro SAB, as a holding company, is trying to achieve, through its *Concurso* plan, an entrustment of the distribution of the assets of its non-debtor U.S. subsidiaries without sufficiently protecting the Objecting Creditors." *Vitro II*, 473 B.R. at 132. Vitro concedes that § 1507, on which it primarily relies, does not explicitly provide for a "discharge" of non-debtors, and thus injunctive relief is a necessary by-product of granting enforcement, but Vitro argues that this fact alone does not mean that it must satisfy the requirements of § 1522.[28] The Objecting Creditors respond that the relief Vitro seeks is addressed by § 1521(a)(1) and (b), and thus Vitro is bound by the limitations in § 1521 and § 1522 that any relief must ensure that the interests of creditors and other interested parties are sufficiently protected.

Contrary to the Objecting Creditors' assertion and the bankruptcy court's finding, the requested relief is not available under any of § 1521's specific provisions because none of the types of relief enumerated under § 1521(a) or §

---

[28] Vitro also argues that § 1521 only applies during the pendency of a foreign insolvency proceeding, and not after the foreign court approves a reorganization plan, and Vitro cites in support *In re Daewoo Logistics Corp.*, 461 B.R. 175, 179-80 (Bankr. S.D.N.Y. 2011). That case only states that "relief may be available after close of the foreign proceeding under section 1507." *Id.* at 180. It does not create a categorical rule and § 1521 does not include such a limitation.

1521(b) matches the type of relief Vitro seeks.  The closest provision is § 1521(a)(1), which provides for "staying the commencement or continuation of an individual action or proceeding *concerning* the debtor's assets, rights, obligations or liabilities."  11 U.S.C. § 1521(a)(1) (emphasis added).[29]  But Vitro is not merely seeking a stay.  Rather, Vitro seeks to permanently enjoin actions brought against its subsidiaries and, moreover, to discharge obligations and liabilities owed by those subsidiaries.  We reject the bankruptcy court's suggestion to treat the assets of Vitro's subsidiaries as Vitro's "assets" for this purpose.  *In re Guyana Dev. Corp.*, 168 B.R. 892, 905 (Bankr. S.D. Tex. 1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary.").  As the Objecting Creditors repeatedly remind us, most of Vitro's subsidiaries have not gone into bankruptcy.  Vitro's subsidiaries are also its creditors.  Thus, there is no basis to conclude that § 1521(a)(1) adequately responds to the type of relief Vitro seeks.[30]

---

[29] Scholarly commentary has suggested that § 1521(a)(1)'s use of the word "concerns" "indicates that a stay of actions against someone other than the debtor or the debtor's assets is a possibility," including "a stay of litigation against a third party with indemnification rights against the debtor, or with shared liability . . . on the theory that the litigation so stayed *concerns* the debtor's rights, obligations or liabilities."  1 Collier, *supra*, ¶ 13.07[2] & n.37 (emphasis in original).  However, the situation in this case is different.  The worry is not that Vitro will be harmed by creditors collecting from the subsidiaries who will in turn come looking for Vitro.  Instead, Vitro's subsidiaries are guarantors, and thus it was Vitro's defaulting on its obligations which now endangers the subsidiaries by triggering the guaranties.

[30] We are aware that under the older § 304(b)(1) a bankruptcy court could "enjoin actions against the debtor with regard to property *involved in* such foreign proceeding" and that "against the debtor" has been understood to include non-debtors "when failure to enjoin the action would jeopardize the success of the bankruptcy process or cause irreparable harm to the debtor's estate and its creditors."  *In re Schimmelpenninck*, 183 F.3d at 362 (internal quotation marks and citation omitted).  However, under 11 U.S.C. § 362(a)(1), which includes the same "against the debtor" language as § 304(b), stays against non-debtors were reserved for "very limited situations."  *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1147 (5th Cir. 1987).  Moreover, unlike in a case such as *In re Schimmelpenninck*, we are not dealing with creditors attempting to recover on a debt under an alter ego and single business enterprise

Nos. 12-10542, 12-10689, 12-10750

For substantially the same reason, we reject the bankruptcy court's suggestion that § 1521(b) applies. Section 1521(b) provides that "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative . . . provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Because the subsidiaries' assets are not Vitro's, § 1521(b) does not apply.[31]

        (b)     Step 2: Section 1521(a)'s grant of "any appropriate relief"

Having determined that none of the enumerated forms of relief listed under § 1521 provides the range of relief Vitro seeks, we proceed to consider whether the relief sought fits into the court's more general power to grant "any appropriate relief." We conclude that the requested relief falls outside § 1521(a)'s grant of authority for two reasons.

First, the relief Vitro seeks, a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief. *In re Pac. Lumber Co.*, 584 F.3d 229, 251-52 (5th Cir. 2009) (discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction); *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) ("Section 524 prohibits the discharge of debts of nondebtors."). Because our law prohibits the requested discharge, a request for such relief more properly falls under § 1507, which was included to address such circumstances.

---

theory. 183 F.3d at 363. Instead, the Objecting Creditors are trying to recover from the subsidiaries under guaranties that were triggered only as a result of Vitro's default. Vitro is not seeking a temporary injunction, but a permanent discharge of the Guarantors' obligations. Vitro itself points out that injunctive relief is only incidental to the broader relief it seeks.

[31] We also note that the Enforcement Motion does not seek relief under § 1521(b). Instead, the Enforcement Motion refers to § 1521(a)(1), (a)(2), (a)(5), and (a)(7). Neither Vitro's nor Fintech's brief argues how these other provisions would apply and they actually appear to present reasons for why the requested relief might not be available under § 1521.

Nos. 12-10542, 12-10689, 12-10750

Second, our conclusion is bolstered by the fact that in the one case where a foreign proceeding's non-debtor discharge was approved by a United States court, it was under § 1507, not § 1521. In *Metcalfe*, the court recognized that "a third-party non-debtor release 'is proper only in rare cases.'" 421 B.R. 685, 694 (Bankr. S.D.N.Y. 2010) (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005)). The court nevertheless found that approval was not precluded under § 1507. *Id.* at 697.[32]

Finally, we note that the bankruptcy court's decision was proper under § 1522, which requires that the relief contemplated under § 1521 balance the interests of the creditors and debtors. *See In re Tri-Cont'l Exch. Ltd.*, 349 B.R. at 637 (analysis of § 1522 "emphasize[s] the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another"). Because the bankruptcy court also found that the *Concurso* plan did not provide for an appropriate balance among the interests of Vitro, its creditors, and the Guarantors under § 1521 and § 1522, we observe that even were we to agree that the requested relief is provided for under § 1521, the bankruptcy court did not abuse its discretion in denying it. Because the reasons for which the bankruptcy court denied relief under § 1521 are largely identical, however, we jointly address those reasons under our discussion of § 1507. We proceed to consider whether, as Vitro and Fintech argue, the relief was available under § 1507, and whether the bankruptcy court properly denied it.

(c)     Step Three: Section 1507's "additional assistance"

The bankruptcy court denied relief under § 1507 because the Plan "does not provide for the distribution of proceeds of the debtor's property substantially

---

[32] While we agree with the bankruptcy court that *Metcalfe* is ultimately distinguishable, *Vitro II*, 473 B.R. at 131, we nevertheless find it instructive in determining which part of Chapter 15 would provide the requested relief.

43

in accordance with the order prescribed by Title 11," contrary to § 1507(b)(4). *Vitro II*, 473 B.R. at 132.

> Under a Chapter 11 plan, the noteholders would receive their distribution from the debtor and would be free to pursue their other obligors, in this case the non-debtor guarantors. The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off.

*Id.*

Vitro challenges the bankruptcy court's holding predominantly on the ground that it accorded insufficient weight to comity. The Objecting Creditors point to disparities between the *Concurso* plan and a similar proceeding in United States bankruptcy court. They also assert that the Mexican court's disregard for a relevant decision in New York state court precludes extending comity to its decision.

We conclude that § 1507 theoretically provides for the relief Vitro seeks because it was intended to provide relief not otherwise available under United States law. But the devil is in the details, and in this case, the bankruptcy court correctly determined that relief was precluded by § 1507(b)(4). Under that provision, the bankruptcy court had to consider whether the relief requested was comparable to that available under the Bankruptcy Code. We conclude below that, although a non-consensual, non-debtor discharge would not be available in this circuit, it could be available in other circuits. We also hold that because Vitro has failed to show the presence of the kind of comparable extraordinary circumstances that would make enforcement of such a plan possible in the United States, the bankruptcy court did not abuse its discretion in denying relief.

Nos. 12-10542, 12-10689, 12-10750

i.     *Availability of non-consensual, non-debtor discharges under § 1507*

This court has previously foreclosed the type of relief sought here in the context of a United States bankruptcy proceeding.  We acknowledge, however, that our view on this subject is not universally shared by our sister circuits.  Although § 1521 relief is precluded by our prior holdings, relief may nevertheless be appropriate under § 1507 which, as discussed above, was included under Chapter 15 to permit the expansion of relief previously available under § 304.  We begin by analyzing release of nondebtors under United States bankruptcy law.

*In re Pacific Lumber Co.* concerned a proposed plan that would "release[] [owners and guarantors] from liability . . . related to proposing, implementing, and administering the [reorganization] plan."  584 F.3d at 251.  Quoting 11 U.S.C. § 524(e)'s language that the "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt," we went on to reject the guarantors' argument that "the release clause is part of their bargain because without the clause neither company would have been willing to provide the plan's financing."  *Id.* at 251-52 (quotation marks omitted).  This conclusion was consistent with prior rulings from this circuit that "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions."  *Id.* at 252; *see also In re Bigler LP*, 442 B.R. 537, 546 (Bankr. S.D. Tex. 2010); *In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010).

Other circuits agree.  *See In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600-02 (10th Cir. 1990); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 972-73 (11th Cir. 1989).  Those circuits not in agreement

45

nevertheless prohibit such releases in all but the rarest of cases.

In *Metromedia*, for example, the court expressed great reluctance in approving non-debtor releases. 416 F.3d at 141. It observed that the Bankruptcy Code expressly authorizes such releases only under 11 U.S.C. § 524(g), a provision authorizing such release upon satisfaction of specific conditions in the context of asbestos cases. *Id.* at 142. That court also noted that the release of non-debtors "is a device that lends itself to abuse" because it "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." *Id.* "No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," and such releases have been appropriate only in "rare cases." *Id.* at 141-42. The *Metromedia* court elaborated that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan," focusing on considerations such as whether: "the estate received substantial consideration . . .; the enjoined claims were channeled to a settlement fund rather than extinguished . . .; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution . . . . and the plan otherwise provided for the full payment of the enjoined claims . . . . [or] the affected creditors consent[ed]." *Id.* at 142-43 (internal citations and quotation marks omitted).

Similarly, in *In re Dow Corning Corp.*, the court observed that enjoining a non-consenting creditor's claim against a non-debtor is a "dramatic measure" and instructed courts to approve such a release only when the following seven factors are present:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the

estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

280 F.3d 648, 658-61 (6th Cir. 2002).

Other courts have imposed similar restrictions on enjoining third-party claims against non-debtors. *See In re Specialty Equip. Cos.*, 3 F.3d 1043, 1044-49 (7th Cir. 1993) (section 524(e) does not bar granting release to third parties where release is consensual and non-coercive and would bind only those creditors voting in favor of the plan); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 701-02 (4th Cir. 1989) (enjoining suits where plan was overwhelmingly approved, late claimants were given opportunity to recover, reorganization hinged on debtor being free from claims against parties with indemnity or contribution claims against it, and creditors who opted out would have had their claims fully satisfied by staying within settlement agreement).

The decisions of these courts demonstrate disagreement among the circuits as to when, if ever, a non-debtor discharge is appropriate. We conclude that, although our court has firmly pronounced its opposition to such releases, relief is not thereby precluded under § 1507, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law. *See Artimm*, 335 B.R. at 160 n.11.

Nos. 12-10542, 12-10689, 12-10750

> ii. *Appropriateness of non-consensual, non-debtor discharges under § 1507*

Having determined that the relief Vitro seeks is theoretically available under § 1507, we turn to whether the bankruptcy court abused its discretion in determining that such relief was not appropriate in this case. The bankruptcy court held a four-day trial, involving hundreds of exhibits and testimony by witnesses from both sides. It concluded that the requested relief did not substantially conform to the order of distribution under Title 11 because the *Concurso* plan provided creditors with a substantially reduced recovery, while cutting off their ability to pursue relief against the Guarantors.

Vitro contends that the bankruptcy court incorrectly denied enforcement because the *Concurso* plan did not provide creditors with exactly what they would have received under Chapter 11.[33] Vitro further challenges the applicability of § 1507(b)(4) because the bankruptcy court based its decision on the discharge of non-debtors' obligations, and not the distribution of Vitro's property. Finally, Vitro argues that whatever concerns this case implicates, the

---

[33] Vitro also argues that the bankruptcy court erred in treating § 1507(b)'s subsections as prongs of a test, as opposed to mere considerations, and did not consider the totality of the circumstances. Although it is not necessary for a plan to meet all § 1507(b) factors, *see In re Bd. of Dirs. of Telecom Arg. S.A.*, 528 F.3d 162, 169 n.7 (2d Cir. 2008) (noting that "Chapter 15 dispenses with the explicit requirement that courts consider the five factors listed in § 304(c) [now § 1507(b)] as part of an application for recognition of foreign insolvency proceedings"), failure to meet any one of these can suffice to deny enforcement, *see In re Treco*, 240 F.3d at 158-61 (denying enforcement because of violation of § 304(c)(4) (now § 1507(b)(4)).

bankruptcy court erred in concluding that they outweighed the interests of comity.[34, 35]

The Objecting Creditors respond that the evidence presented at trial demonstrated that, under the *Concurso* plan, they would recover only around 40% of the Old Notes' value, while Vitro's shareholders would retain equity interests worth $500 million.[36] They also point to various parts of the Plan that

---

[34] Fintech also argues that failure to enforce the Plan would encourage investors to resort to litigation, instead of negotiating compromises with a debtor in bankruptcy. Given our very limited holding on the facts of this case we find this to be a slight risk. Even were it otherwise, we are bound to apply the statutory provisions of Chapter 15 faithfully irrespective of whether the effect will be to spur further litigation.

[35] The parties dispute whether we need to consider the traditional factors of comity. In *International Transactions, Ltd.* we enumerated five requirements that would make a foreign court's judgment on a matter conclusive in federal court. 347 F.3d at 594. Section 1507 explicitly incorporates comity, however, and thus, given our reasoning above, we assume that comity would be granted were the Plan to also reasonably address the concerns enumerated in § 1507(b)(1)-(4). *See In re Treco*, 240 F.3d at 158 (observing that § 304(c) (now § 1507(b)) supplants federal common law analysis).

[36] The Objecting Creditors' briefs largely omit any discussion of how the distributions under the *Concurso* plan, including the New 2019 Notes, the MCDs, and the cash consideration, resulted in this amount. The Objecting Creditors' witness, Dan Gropper, a managing director of one of the Noteholders, testified as a fact witness on this issue. Gropper was uncertain of what worth, for example, the MCDs, which convert into 20% equity in Vitro upon Vitro's default, would have, given the questionable value of equity in a defaulting company. The bankruptcy court made no specific factual findings in his regard, and thus we are left with the court's more general observation that creditors would, under the Plan, receive a fraction of what they would have received under the Old Notes.

The Objecting Creditors also make much of testimony by their expert witness, Dr. Joseph W. Doherty, that there was only a 10,000 to 1 chance that Vitro would have received a distribution in United States bankruptcy court like that resulting from the *concurso* proceeding. But this calculation was not based on any case-by-case comparison between Vitro and other bankruptcies. Instead, it was based on a sample of cases drawn from an incomplete database of bankruptcy proceedings, which, at the time, contained 108 relevant cases, of which 37 involved any distributions of equity. Doherty himself admitted that the database was still in the process of being compiled and presently contained only cases with information easily available on the Public Access to Court Electronic Records database ("PACER"). Statistical evidence of this variety is, to say the least, of limited value when considering the complexities of bankruptcy proceedings of this scale. The bankruptcy court acknowledged that Doherty testified as to "[t]he wide variance in return to creditors from what would be expected in a Chapter 11 plan," but only found that testimony "credible," without making any specific factual findings, and only made his credibility finding within the scope of arguments the court

do not conform with Chapter 11. These include that guarantor obligations cannot be discharged over the objections of creditors, creditors would not have been grouped for voting purposes into a single class together with parties having adverse interests, and insider votes would not count towards the Plan's approval. The Objecting Creditors further argue that comity does not weigh in favor of enforcement of this plan because the Mexican court, which approved it, ignored a ruling by a New York state court holding that the indentures expressly prohibited modification of the Guarantors' obligations.

We conclude that the evidence Vitro presented at trial does not support the presence of circumstances comparable to those necessary for effectuating the release of non-debtor guarantors in those of our sister circuits that allow such a release. *See In re Schimmelpenninck*, 183 F.3d at 364.

We begin our analysis, as we must, by considering comity. 11 U.S.C. § 1507 (court may grant "additional assistance . . . consistent with principles of comity"). In revising Chapter 15's predecessor, § 304, Congress elevated comity from a factor under § 304(c) to the introductory text of § 1507 "to make it clear that it is the central concept to be addressed." H.R. Rep. No. 109-31, pt. 1, at 109. Vitro is thus correct to focus its argument on comity, and we agree with Vitro that comity is the rule under Chapter 15, not the exception. It is thus necessary to first address the Objecting Creditors' most direct challenge to that principle, namely that the Mexican court failed to extend comity to the decision of a New York state court on issues central to this case. *See United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 170 (3d Cir. 1997) (reciprocity is condition for honoring foreign country's judicial decrees); *Remington Rand Corp.-Del. v. Bus.*

---

did not reach.

Nos. 12-10542, 12-10689, 12-10750

*Sys. Inc.*, 830 F.2d 1260, 1273 (3d Cir. 1987) (describing comity as a "two-way street").[37]

The New York state court addressed a declaratory judgment action brought by Wilmington, which sought a confirmation of Vitro's obligations under the indentures. *Wilmington Trust*, 2011 WL 6141025, at *1. The state court carefully parsed the issues before it and determined that "any declaratory relief in this court can only be in the context of determining the rights and obligation of the parties under the Indentures." *Id.* at *5. The court next determined that the indentures were governed by New York law and that "pursuant to the relevant provisions of the Indentures . . . any non-consensual . . . release, discharge or modification of the Guarantors' obligations is prohibited." *Id.* The court was clear, however, that its authority went no further. "Whether such rights and obligations can or cannot be novated, substituted, released or modified under the Mexican bankruptcy law is an issue for the Mexican Court." *Id.* To remove all doubt, the court explicitly stated that "granting a declaratory judgment in favor of [the Objecting Creditors], to the extent stated herein, will not interfere with the Mexican Court proceeding, which is the proper jurisdiction to determine the issues that may arise in connection with the approval of the Concurso Plan, pursuant to applicable Mexican law." *Id.* The court concluded by stating that "whether any Concurso Plan that is ultimately approved by the Mexican Court may be enforced in the United States is an issue for the federal courts, including the Bankruptcy Court." *Id.*

The Mexican court was presented with the opportunity to consider the New York decision and its impact on the *concurso* proceeding. Although the Mexican court does not appear to have provided specific reasons, we infer from its decision that it did not find that the indentures precluded Mexican law from

[37] We found the discussion on this issue in the amicus curiae brief filed by the United Mexican States of assistance.

51

novating the obligations contained therein. Because the New York court explicitly set aside this issue for the Mexican court, reciprocity was not offended by the Mexican court's subsequent decision of that very issue. We thus do not view this as a ground for denying comity. Our decision comports with the approach adopted by the court in *Metcalfe*, which, while recognizing that a third-party non-debtor release might be inappropriate under United States law, left it to the Canadian courts to determine whether they had the jurisdiction to grant such relief. 421 B.R. at 697-700.

We next consider whether the bankruptcy court erred in basing its decision on § 1507(b)(4).[38] Section 1507(b)(4) provides that a court should consider whether to grant additional assistance to a foreign representative by considering the "distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title." Vitro asserts that the bankruptcy court's opinion was based on the distribution of non-debtor's property, that of Vitro's subsidiaries, and thus § 1507(b)(4) is inapplicable. But the focus of § 1507(b)(4) is on the plan of distribution, and Vitro ignores that the Plan it seeks to enforce premises distribution of its assets on the discharge of obligations owed by non-debtors who are also Vitro's creditors. The respective amounts that Vitro pays under the Plan to the Objecting Creditors and to its subsidiaries are inescapably dependent on the discharge of the non-debtor Guarantors. That the detriment of this distribution falls on the Objecting Creditors, whose rights are extinguished in exchange for their distribution under the Plan, in no way subtracts from the fact that the release affects how the proceeds of Vitro's property are distributed.

---

[38] Because the bankruptcy court did not discuss whether § 1507(b)(1)-(3) weighed in favor of, or against, granting relief, and because we find that relief was properly denied on other grounds, we do not reach the Objecting Creditors' argument that the *Concurso* plan violated § 1507(b)'s other subsections.

We turn finally to whether the evidence Vitro has presented in favor of comity and enforcement so outweighed the bankruptcy court's concerns under § 1507(b)(4) that it was an abuse of discretion for the bankruptcy court to deny relief. Vitro's primary witness was its foreign representative, Sanchez-Mujica. He testified that the *conciliador* persuaded Vitro to offer more favorable terms to third-party creditors in the *Concurso* plan. These included a 5% increase—from 15% to 20%—of the equity available on default under the MCDs, and that consent payments, previously made to only some of the creditors, be extended to all consenting creditors. But this hardly shows that the result of the *concurso* proceeding is in line with what would be available under Chapter 11, much less that this case features the unique circumstances that would warrant a general release of the non-debtor subsidiaries. Sanchez-Mujica also testified that over 74% of recognized creditors approved the plan. But this ignores that recognized creditors holding over 50% of all unsecured debt who voted in favor of the Plan were Vitro subsidiaries.

Vitro's second witness, Luis Mejan—an expert in Mexican bankruptcy law—was cross-examined at trial, and his expert report and expert rebuttal were introduced in lieu of direct examination. Mejan's expert report provides a comprehensive breakdown of the LCM and how it operates in the *concurso* context. This merely establishes, however, that the LCM is a process comparable to that of the United States, a fact which no party seriously disputes. The bankruptcy court also had to consider whether the results yielded under the LCM, on the facts of this case, were comparable to the result likely in the United States. *See In re Treco*, 240 F.3d at 159 ("A court must consider the effect of the difference in the law on the creditor in light of the particular facts presented."); *In re Sivec SRL*, 476 B.R. at 324 ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity. What this Court must consider is the effect of that difference on the creditor in light

of the existing facts."). Mejan's expert report extensively describes Mexican law, but does not explain how the results achieved in this case would compare to those in a United States bankruptcy proceeding. When asked if he had considered "whether other plans that had been approved or enforced in the United States were comparable to Vitro in terms of what happened in the Mexican proceedings," Mejan conceded that he "did not conduct a specific search in order to make [that] comparison."[39] This failure is especially troubling given Vitro's request for relief which, under United States law, would not be available in this circuit, and would only be available under the narrowest of circumstances in some of our sister circuits.[40]

In summary, although extensive testimony was taken before the bankruptcy court that the LCM's legal framework is substantially in accordance with our own, this does not end the analysis of whether to grant comity. *See In re Treco*, 240 F.3d at 158-61 (bankruptcy court abused its discretion by affording comity to Bahamian bankruptcy proceeding without considering effects on creditor's claim). The bankruptcy court correctly observed that we have "largely foreclosed non-consensual non-debtor releases and permanent injunctions outside of the context of mass tort claims being channeled toward a specific pool

---

[39] Mejan's rebuttal report also seeks to undermine the Objecting Creditors' claim that there is a debate in the Mexican legal community as to whether insiders are allowed to vote. Regardless of whether such a debate exists, or whether the LCM permits it or not, it is surely the case that in the United States insider voters cannot themselves push through a plan where there is a class of dissenting creditors. *See CIBC Bank & Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil*, 886 F. Supp. 1105, 1114 (S.D.N.Y. 1995) (citing 11 U.S.C. § 1129(a)(10)) (Bankruptcy Code "prevents 'insiders' from voting on whether a reorganization plan will be accepted by a class of impaired creditors"). As we have explained previously, the Bankruptcy Code requires that at least one impaired class of creditors approve a plan, where the class is made up of claims that are substantially similar or share the impaired creditors' interests. *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011).

[40] Vitro also called as a rebuttal witness Claudio Del Valle, Vitro's chief financial and restructuring officer. That witness testified as to the amount of default interest recognized in the *concurso* proceeding.

of assets." *Vitro II*, 473 B.R. at 131.  There appears little dispute that, under United States law, non-debtor releases, while possible in other circuits, are only appropriate in extraordinary circumstances.   To that end, Vitro was required to show that something comparable to such circumstances was present here. The mere fact that the *concurso* proceeding complied with the relevant provisions of the LCM is not, in itself, sufficient. Were it otherwise, we would be treating the extraordinary relief available under § 1507 with the casual indifference we have already rejected in the context of recognition determinations under Chapter 15.  *See In re Ran*, 607 F.3d at 1021 (recognition determination is not a "rubber stamp exercise").  We would also be disregarding the considerations and safeguards Congress included in § 1507(b).

To that end, we observe that many of the factors that might sway us in favor of granting comity and reversing the bankruptcy court to that end are absent here.  Vitro has not shown that there existed truly unusual circumstances necessitating the release.   To the contrary, the evidence shows that equity retained substantial value.  The creditors also did not receive a distribution close to what they were originally owed.  Moreover, the affected creditors did not consent to the Plan, but were grouped together into a class with insider voters who only existed by virtue of Vitro reshuffling its financial obligations between it and its subsidiaries.  It is also not the case that the majority of the impacted group of creditors, consisting predominantly of the Objecting Creditors, voted in favor of the Plan.  Nor were non-consenting creditors given an alternative to recover what they were owed in full.[41]

---

[41] Vitro stresses that the Objecting Creditors are sophisticated parties, and that many noteholders did not purchase notes until after Vitro had defaulted, the implication being that creditors knew what they were getting into.  As a preliminary matter, it appears to us that all the parties involved are "sophisticated."  We also do not understand why an investor's background should excuse a plan's failure to substantially adhere to our law's order of distribution.

We similarly reject the argument that because the Objecting Creditors participated in

Vitro cannot rely on the fact that a substantial majority of unsecured creditors voted in favor of the Plan. Vitro's majority depends on votes by insiders. To allow it to use this as a ground to support enforcement would amount to letting one discrepancy between our law and that of Mexico (approval of a reorganization plan by insider votes over the objections of creditors) make up for another (the discharge of non-debtor guarantors). *Cf. CIBC Bank & Trust Co. (Cayman) Ltd.*, 886 F. Supp. at 1114.[42]

Vitro argues that there would be financial chaos as a result of the Plan not being enforced. We are aware of the adverse consequences that may ensue from the decision not to enforce the Plan. But Vitro's reasoning seeks to justify a prior bad decision on the basis that not enforcing it now would lead to further negative consequences.[43] Worse, the harm from those consequences would predominantly affect Vitro, the party responsible for bringing about this state of affairs in the first place. Vitro cannot propose a plan that fails to substantially comply with our order of distribution and then defend such a plan by arguing that it would suffer were it not enforced. Vitro's two-wrongs-make-a-right reasoning is unpersuasive.

Those cases Vitro points to in which a similar discharge of non-debtor obligations was allowed are inapposite. The closest factual analog to this case

the *concurso* proceeding they are now estopped from resisting Vitro's Chapter 15 action. Chapter 15's protections address a separate set of concerns beyond what may have been litigated in a foreign proceeding.

[42] For the same reasons we conclude that, even if § 1521 did provide the broad relief Vitro seeks, enforcement of this Plan would be precluded under § 1522 for failing to provide an adequate "balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." *In re Int'l Banking Corp. B.S.C.*, 439 B.R. at 626 (quoting Model Law Guide, *supra*, ¶ 161); *see also In re Sivec SRL*, 476 B.R. at 323.

[43] Sanchez-Mujica's declaration only states that "Vitro's business, as well as those who have an interest in seeing Vitro's business succeed, such as its customers and creditors, will continue to suffer immense harm" if the Plan is not enforced.

is the bankruptcy court's decision in *Metcalfe*. As here, the central issue in *Metcalfe* was "[t]he enforceability of the non-debtor release and injunction on private civil actions in the United States" contained in a Canadian court order approving a restructuring plan. 421 B.R. at 687-88 n.1. Recognizing that "a third-party non-debtor release 'is proper only in rare cases,'" *id.* at 694 (quoting *Metromedia*, 416 F.3d at 141), the court nevertheless found that approval was not precluded under § 1507, *id.* at 697. The only explanation the court provided was that the non-debtor release and injunction provisions "treat[ed] all claimants in the Canadian Proceedings similarly" and that "[n]o objections ha[d] been lodged that inclusion of these provisions adversely affects any claimant's treatment against any of the debtors' property." *Id.* The bankruptcy court distinguished *Metcalfe* because, in that case, "there was near unanimous approval of the plan by the creditors, who were not insiders of the debtor . . . . the plan was negotiated between the parties and there appears not to have been a timely objection . . . . [and] the release was not complete like the one in the present case." *Vitro II*, 473 B.R. at 131.

We agree that *Metcalfe* is distinguishable. The fact that the Plan approved here was the result of votes by insiders holding intercompany debt means that, although under *Metcalfe* non-debtor releases may be enforced in the United States under Chapter 15, the facts of this case exceed the scope of that decision. We further observe that in that case the Canadian court's decision to approve the non-debtor release "reflect[ed] similar sensitivity to the circumstances justifying approving such provisions," a sensitivity we find absent in the Mexican court's approval of the Plan. 421 B.R. at 698. The Canadian court's decision was also the result of "near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the global financial crisis." *Id.* at 700. As already discussed, Vitro's evidence on this point largely emphasizes the turmoil only Vitro would be exposed to.

Vitro also relies on our decision in *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987). In that case, "we address[ed] the question whether [the] bankruptcy court's confirmation order which, beyond the statutory grant of the [Bankruptcy] Code, expressly released a third-party guarantor, [was] to be given *res judicata* effect." *Id.* at 1047. We held that once a reorganization plan passed the appeal stage it could not be challenged even though it violated the Bankruptcy Code's prohibition on such discharges. *Id.* at 1050. Aside from the fact that *Republic Supply Co.* was a case about the effects of res judicata and has been distinguished for not addressing the legality of non-debtor releases, *see In re Pacific Lumber Co.*, 584 F.3d at 252 n.27, we have also emphasized the "limited nature" of that decision, *In re Applewood Chair Co.*, 203 F.3d 914, 918 (5th Cir. 2000). For example, *Republic Supply Co.* involved a reorganization plan in which a third-party guarantor and creditor were specifically discharged. 815 F.2d at 1051-54. We have distinguished other cases for including general, as opposed to specific, releases. *Applewood Chair*, 203 F.3d at 919. As a result, *Republic Supply Co.* provides no guidance where, as here, we are confronted not by a specific release, but by a general release of all the non-debtor subsidiaries. *See id.*[44, 45]

On the basis of the foregoing analysis, we hold that Vitro has not met its burden of showing that the relief requested under the Plan—a non-consensual discharge of non-debtor guarantors—is substantially in accordance with the circumstances that would warrant such relief in the United States. In so

---

[44] Presumably, Vitro is arguing that the Mexican court's decision is the prior action and, thus, the bankruptcy court and this court are required to recognize that foreign court's holding and confer it res judicata effect. Such reasoning conflates the difference between a foreign ruling and the bankruptcy court's decision to grant relief pursuant to Chapter 15, and is rejected.

[45] The other cases Vitro and Fintech cite in support appear to have involved consensual agreements between the parties and are thus inapposite.

holding, we stress the deferential standard under which we review the bankruptcy court's determination.  It is not our role to determine whether the above-summarized evidence would lead us to the same conclusion.  Our only task is to determine whether the bankruptcy court's decision was reasonable.  *See Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 578 (5th Cir. 2002) ("'Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court.'" (quoting *Dawson v. United States*, 68 F.3d 886, 896 (5th Cir. 1995))); *Bear Stearns*, 389 B.R. at 333 (relief under § 1521 and § 1507 is largely discretionary).  Having reviewed the record and relevant caselaw, we conclude that the bankruptcy court's decision was reasonable.

### 4.    Section 1506's Bar to Relief

The bankruptcy court concluded that "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and held that even if Chapter 15 relief were appropriate, it would be barred under § 1506 because "the *Concurso* plan does not recognize and protect such rights."  *Vitro II*, 473 B.R. at 132.

Section 1506 provides that "[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The narrow public policy exception contained in § 1506 "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States."  *In re Ran*, 607 F.3d at 1021.  "The key determination required by this Court is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness."  *Metcalfe*, 421 B.R. at 697.  A court need not engage in an "independent determination about the propriety of individual acts of a foreign court."  *Id.*  Furthermore, even the absence of certain procedural or constitutional rights will

not itself be a bar under § 1506. *See In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) ("Federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.").

As already discussed, this court holds that the Bankruptcy Code precludes non-consensual, non-debtor releases. *In re Pac. Lumber Co.*, 584 F.3d at 252. Nevertheless, not all our sister circuits agree, and we recognize that the relief potentially available under § 1507 was intended to be expansive. At the same time, § 1506 was intended to be read narrowly, a fact that does not sit well with the bankruptcy court's broad description of the fundamental policy at stake as "the protection of third party claims in a bankruptcy case." *Vitro II*, 473 B.R. at 132. Because we conclude that relief is not warranted under § 1507, however, and would also not be available under § 1521, we do not reach whether the *Concurso* plan would be manifestly contrary to a fundamental public policy of the United States.[46]

## IV. CONCLUSION

For the aforementioned reasons, we AFFIRM in all respects the judgment of the district court affirming the order of the bankruptcy court in No. 12-10542, and we AFFIRM the order of the bankruptcy court in Nos. 12-10689 and 12-10750. The temporary restraining order originally entered by the bankruptcy court, the expiration of which was stayed by this court, is VACATED, effective with the issuance of our mandate in Nos. 12-10689 and 12-10750. Each party shall bear its own costs.

---

[46] For the same reason, we do not reach the Objecting Creditors' arguments that the Plan violates a fundamental public policy for infringing on the absolute priority rule, the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et seq.*, or the interests of the United States in protecting creditors from so called "bad faith schemes."